ATLANTIC CITY ELECTRIC CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SCRANTON ELECTRIC CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 17871, 17872. Promulgated March 26, 1929.

*Courtland Kelsey, Esq.*, for the petitioners.
*Eugene Meacham, Esq.*, and *C. E. Lowery, Esq.*, for respondent.

OPINION.

MILLIKEN: The principal question involved in these proceedings concerns the right of the affiliation of the petitioners with the American Gas & Electric Co. Corporations are deemed to be affiliated when one corporation owns or controls through closely affiliated interests substantially all of the stock of the other or others or when substantially all of the stock of two or more corporations is owned or controlled by the same interests.

In the instant case the parent corporation is the American Gas & Electric Co., which will hereinafter be referred to as the parent company, which established headquarters in New York City and is engaged in the lighting and power business in approximately 35 cities. Its business is carried on through local corporations in each

community, which it serves in order to comply with local laws or conditions, but in each instance, as in that of the petitioners, the parent company owned the entire common stock and thus retained at all times absolute control of the business and substantially all of the stock of the subsidiary. In some cases, where improvements, additions, or extensions were made by a subsidiary, preferred stock was issued by the local subsidiary to pay for the same. In the case of petitioners, this preferred stock was 6 per cent cumulative with voting rights but was redeemable at any time at the option of the company. In the case of the Atlantic City Electric Co., the preferred stock amounted to a little less than 23 per cent of the total outstanding stock, while in the Scranton Electric Co. it represented less than 30 per cent. A great deal of the preferred stock was owned by stockholders of the parent company. All of the officers of both petitioners occupied similar positions with the parent company, as did also all the directors except four in the Scranton Electric Co. The salaries of the officers were paid by petitioners, who immediately turned them over to the parent company, which paid the officers for their services to all companies. All directors' meetings were held in the office of the parent company, whence came directions to all subsidiaries, including the petitioners, as to the conduct of their business, to the most minute detail. Receipts of all companies were collected and deposited with the local employees and could only be disbursed by officers of the local company who were also officers of the parent company. No improvements or capital expenditures could be made, except after approval by the parent company, and all such work was planned and performed under the supervision of its engineering department. Materials in quantity were likewise purchased through and by the parent company. Matters of policy such as the determination of depreciation rates, charging off bad debts, and expansion programs were under the direct supervision of the parent company.

The accounting systems of petitioners were installed by and operated in accordance with the direction of the parent company, which directed all financial transactions. When advances of sums of money were needed by the petitioners, the parent company made such advances without security from the former and in order to repay such advances, preferred stock or bonds of the petitioners were from time to time issued, which bonds and stock were guaranteed by the parent company and usually sold by them.

By reason of the provisions of the collateral trust agreement, the petitioners were prohibited from issuing voting preferred stock which would represent more than 30 per cent of the total outstanding capital stock of either of the petitioners. The charter of each of the petitioners provided that the preferred stock might be redeemed by

the common *at any time*. The company therefore had it within its power, if necessity therefor arose, to call in and redeem the preferred stock of the petitioners. The power to exercise such a right by the company goes further than a mere option which a parent company may have providing that it is to be given the first call as to the purchase of the stock of a stockholder if the latter desires to sell. The preferred stockholders of petitioners had no election whatsoever but to turn in their stock and have it redeemed if the parent company desired the same. The holder of the preferred stock resembled a creditor of the corporation more than he resembled a common stockholder. Like a creditor, he was entitled to a return on his money invested, to have his money repaid before a common stockholder, but likewise he does not share in the earnings or assets except to a specified extent. He could in this case be paid off at any time and his connection with the petitioners terminated. There was also no provision whereby his stock could be exchanged for common stock. In the entire history of these petitioners it does not appear that any holder of preferred stock ever objected to any corporate action. The dividends on the preferred stock at all times have been promptly paid.

The dominant purpose sought to be attained by the Congress in providing for consolidated returns was to prevent or neutralize intercompany transactions that would result in tax evasions. It sought to tax as a whole what in truth was the income of but a single enterprise. When we seek to give effect to that purpose, resort should be had to all the facts obtaining and not merely set up a dead line, beyond which we will not go, that is marked only by mere percentages of stock ownership. Looking to and giving proper significance as concerns stock ownership, limitations surrounding the ownership of preferred stock, and the complete business dominance of petitioners by the parent company, we believe the test has been met and the petitioners and the parent company should be required to file consolidated returns for the years in question.

A decision in support of the views herein taken is the recent case of *Great Lakes Hotel Co.* v. *Commissioner*, 30 Fed. (2d) 1.

In that case one corporation with closely affiliated interests owned 71 per cent of the stock of three other corporations, 78 per cent of the stock of a fourth, and 90 per cent of the stock of two others. There was an understanding that if minority stockholders wished to sell their stock, they would first offer it to the majority stockholders. All but two of the corporations carried on separate and distinct kinds of business, but each was a part of the general scheme or system relating to the construction, financing, and operation of

hotels. The court held the corporations were affiliated and said in part:

Without going into an extensive discussion, we will merely state our conclusions, which are:

(a) The word "controlled" is more comprehensive than the word "owned" as used in this section.

(b) The "same interests" and "closely affiliated interests" describe the same group, the latter expression enlarging what might otherwise be embraced in the term "same interests." Both expressions were intended to include more than "same owner." An examination of the facts in each case is necessary to ascertain who, among the stockholders, comprise the group thus designated.

(c) "Substantially all the stock" is a lax, indefinite expression which, under the rulings of the Board, is equivalent to "a large majority." Its limitations cannot be defined with exactness or certainty. When the Commissioner promulgated article 633 of its regulations 45 and announced that ownership of more than 51% of the capital stock of the corporation might, under certain circumstances, be "substantially all of the stock" he was exercising legislative rather than administrative powers and acting beyond his authority.

Applying these conclusions to the facts in the case before us, we have no hesitancy in holding that the majority stockholders in each of the six corporations comprise a group which comes within the statutory designation of "closely affiliated interests." They were guided in their action by a common interest and their common object was attained by all corporations pursuing the same methods through the same agencies. In addition to owning more than one-half of the stock, these "closely affiliated interests" *controlled* other stock. For example, there was an understanding that if any minority stockholder wished to sell his stock, it should first be offered for sale to H. L. Stevens & Co., and as a matter of practice such minority stockholders offered their stock to H. L. Stevens & Co., and this company actually purchased the stock thus offered. In addition the various minority stockholders executed proxies to the "closely affiliated interests" by the terms of which the latter were authorized to vote for, and act for, the former. A large group of minority stockholders made sworn statements that "at the time they purchased their stock * * * they had full confidence in the rectitude and business ability of H. L. Stevens and that they anticipated that he would continue as president of the Stevens Co. and that if they desired to sell their stock it was their understanding they should first offer it for sale to H. L. Stevens & Co."

Upon this record, we are satisfied that such stock was controlled by the so-called closely affiliated interests and that such stock, added to the stock owned by the group that comprised the closely affiliated interests, constituted substantially all of the stock of these corporations.

It follows from what has been said that petitioners and H. L. Stevens & Co., the Metropolitan Mortgage Co., Olmsted Hotel Co., The Lake Erie Hotel Co., and Valley Farm were affiliated domestic corporations within the meaning of Section 240 (b) and were required to make a consolidated return of their net income and to have their taxes computed and determined upon the basis of such consolidated return.

See also *Lavenstein Corporation* v. *Commissioner*, 25 Fed. (2d) 375.

In the case of *Wilshire Oil Co.*, 13 B. T. A. 1150, three brothers owned all the stock of one corporation and 72 per cent of the stock of another. About half the remaining stock was owned by those

described as " friends and associates " and the remaining half by " the public." In the course of the decision in that case the Board said:

When credit, material, supplies, services or any assistance was needed by Bandini Company, it was supplied by petitioner or its stockholders. The stock in the hands of the public as distinguished from that represented by the pre-organization subscription agreement was at all times agreeable to the management and conduct of the business of Bandini Company by the Machris Brothers.

The case is strikingly like that of *Midland Refining Company*, Dec. 625, 2 B. T. A. 292, 296. There, as here, one company was an oil refining company and the other was a producing or drilling company organized for the purpose of providing crude oil for the former. The refining company took all the crude oil produced by the drilling company and there were inter-company transactions similar to those in the instant case, such as loaning of money, facilities and equipment, interchange of officers and employees, occupation of same officers, and absolute domination of the business of both companies by three persons, who endeavored to make both companies successful.

In that case, the dominant stockholders originally owned 90 per cent of the stock in the refining company and 78.26 per cent in the producing company, but part of their holdings was sold to friends, business associates and employees so that their holdings were reduced to 62.71 per cent and 51.07 per cent, respectively, yet on account of the close business relationship, we held that substantially all of the capital stock of both corporations was owned or controlled by the same interests.

See also *Bank of Italy*, 13 B. T. A. 1226.

We are not unmindful of the recent cases of *Ice Service Co.* v. *Commissioner*, 30 Fed. (2d) 230, and *Commissioner* v. *Adolph Hirsch & Co.*, 30 Fed. (2d) 645. In each of these cases there was a large minority interest, which was not controlled by the majority, and it was upon this lack of control that the cases were decided, while in the instant case we think the redemption feature attaching to the preferred stock left it in the control of the owners of the common stock.

Relative to the claim of the Scranton Electric Co. to affiliation with the Lackawanna Light Co., we accept the testimony of record that the Scranton Electric Co. was the owner of the entire capital stock of $400,000 of the Lackawanna Light Co. The Scranton Electric Co. is entitled to affiliation with the Lackawanna Light Co. and should file a consolidated return with it.

The remaining questions relate to the invested capital of the respective petitioners for the year 1917. We think the respondent erred in reducing invested capital by deducting the full amount of their 1916 taxes as of January 1, 1917. Invested capital should be reduced when such tax becomes due and payable. *All America Cables, Inc.*, 10 B. T. A. 213.

The respondent erred in reducing the invested capital of the Scranton Electric Co. for 1917 by $108,237.50, representing dividends

declared or paid during the first 60 days of that year, as the uncontradicted evidence is to the effect that only $66,050 in dividends was declared or paid during the first 60 days of the year.

*Judgment will be entered under Rule 50.*